## In re CLIFT'S ESTATE

No. 4569.   Decided October 15, 1927.   (260 P. 859.)

*P. T. Farnsworth, W. Q. Van Cott,* and *Grant H. Bagley,* all of Salt Lake City, for appellants.

*Harvey H. Cluff,* Atty. Gen., and *L. A. Miner,* Asst. Atty. Gen., for respondent.

THURMAN, C. J.

Virtue Clift, a resident of Salt Lake City, and owner of real and personal property therein, died testate October 23, 1925. This appeal involves certain objections made by the appellants concerning the appraisement of that portion of the real property of said estate known as the Clift Building, situated on the northwest corner of Main and Third South streets in said city. The personal property and other real property is not involved in this appeal, and no further reference will be made thereto.

The property known as the Clift Building is an office building, and at the time of the appraisement was incumbered by two mortgages or trust deeds made to secure two bond issues, the first for $450,000 and the second for $80,000. The state inheritance tax appraisers appraised the property at $420,000. The executors of the estate and one of the heirs, appellants here, interposed objections to the appraisement, alleging that, if the appraisement was intended to cover the entire property, the appraisement was too low. If it was intended to cover only the equity of the estate therein, the appraisement was too high. Hence the first objection that the amount at which the property was appraised was not the market value of said property in the ordinary course of trade; that the market value, in the ordinary course of trade, does not exceed the sum of $860,000. The second objection was that the appraisement is ambiguous in the respects hereinbefore mentioned. A hearing was had upon the objections, before the district court of Salt Lake county, as a proceeding in equity. The court found there was an ambiguity in the appraisement, and permitted the appraisers to withdraw their report and amend it so as to cover the entire property. On the question of value the court found that the value of the entire property as shown by the amended appraisement, to wit, the sum of $950,000, was its true value. Judgment was entered accordingly. The objectors appeal and assign as error the findings and judgment of the court.

The first contention is that the court erred in permitting the appraisers to amend their appraisement. Appellants rely on the provisions of Comp. Laws Utah 1917, § 3191, as amended in Sess. Laws 1919, at pp. 168, 169, which reads as follows:

"The Attorney General or any person interested in the estate appraised, may, within thirty days thereafter, file objections to said appraisement on the hearing of which as an action in equity, either party may produce evidence competent or material to the matters therein involved. If, upon such hearing, the court finds the amount at which the property is appraised is at its value on the market in the ordinary course of trade, and the appraisement was fairly and in good faith made, it shall approve such appraisement; but if it finds that the appraisement was made at a greater or less sum than the value of the property in the ordinary course of trade, or that the same was not fairly or in good faith made, it shall set aside the appraisement, appoint new appraisers, and so proceed until a fair and good appraisement of the property is made at its value in the market in the ordinary course of trade. The Attorney General, or any one interested in the property appraised, may appeal to the Supreme Court from the order of the district court approving or setting aside any appraisement to which exemptions have been filed. Notice of appeal shall be served within thirty days from the date of the order appealed from, and the appeal shall be perfected in the time now provided for appeals in equitable actions. In case of appeal, the appellant, if he is not the Attorney General, shall give bond to be approved by the clerk of the court, to pay the tax, which bond shall provide that the said appellant and sureties shall pay the tax, for which the property may be liable, with cost of appeal. If upon the hearing of objections to the appraisement, the court finds that the property is not subject to the tax, the court shall upon expiration of time for appeal, when no appeal has been taken, order the clerk to enter upon the lien book a cancellation of any claim or lien for taxes. If at the end of thirty days from the filing of the appraisement with the clerk, no objections are filed, the appraisement shall stand approved."

Appellants contend there was an ambiguity in the original appraisement. That is the foundation of their second objection. Upon this question the court heard evidence as to why the appraisers appraised the property at only $420,000.

The testimony, without contradiction, developed the fact that the appraisers found the value of the entire property to be $950,000. But, as it was incumbered to the extent of $530,000 by the two bond issues referred to, they conceived the idea that only her equity, $420,000, was subject to the tax, and therefore appraised her equity only. In the last analysis their conclusion was right as applied to the instant case, for her equity was all that could be legally taxed, but it was their duty under the statute to appraise the entire property at its market value in the ordinary course of trade, as such value existed at the time of her death, October 23, 1925. Deductions for debt and every form of deduction is a matter for the court to compute and determine. It was a mistake on the part of the appraisers in form only, and not in substance, as applied to the case at bar. Neither the appellants nor the estate of Virtue Clift, which they represent, were in any manner prejudiced by the mistake. The court did not err in permitting the appraisers to withdraw their first report and amend it so as to conform to the provision of Comp. Laws Utah 1917, § 3193, as amended in 1919 (Laws 1919, c. 64), which provides that all the property of the decedent, except as therein stated, should be appraised at its market value in the ordinary course of trade. It would have been a travesty of the special procedure provided by the statute we have quoted, and upon which appellants rely to have set the appraisement aside and appointed new appraisers to appraise the property because of the ambiguity complained of. We have not overlooked the following authorities cited by appellants: *Crerar's Estate,* 56 App. Div. 479, 67 N. Y. S. 795; In re *Moneypenny's Estate,* 181 Pa. 309, 37 A. 589; In re *Niven,* 29 Misc. Rep. 550, 61 N. Y. S. 956; *Smith's Estate,* 40 App. Div. 480, 58 N. Y. S. 128; *Brown's Estate,* 54 Utah, 73, 179 P. 652.

The most casual examination of the cases cited shows clearly that they have no application to the case at bar. The most that can be said of them is that, as the inheritance tax

procedure is a special procedure, and not one in the ordinary course of law, its provisions should be strictly complied with. Granting that to be true, appellants have no standing here as far as this objection is concerned. Neither the statute above quoted nor any statute of Utah with which we are familiar authorizes the setting aside of an appraisement and the appointment of new appraisers because of an ambiguity in the appraisement reported. Nor is it reasonable that an appraisement should be set aside on such ground and new appraisers appointed, where, as in the instant case, the ambiguity can be explained by evidence, and shown to be without prejudice to the objectors.

But the objection that the property was not appraised at its market value in the ordinary course of trade, as required by the statute, presents a closer question. All of the witnesses in the case appear to have been experienced in matters pertaining to the value of real estate in Salt Lake City. Five of such witnesses were sworn and testified on behalf of appellants, and three on the part of respondent. The three who testified for the respondent were the appraisers who made the appraisement. It is contended by appellants that the findings of the court as to the value of the property are against the clear preponderance of the evidence. Many technical objections were also made to the findings. The following is a reasonably full and fair synopsis of the evidence upon which the trial court based its findings as to value.

Lawrence Heath, one of the executors and witness for appellants, testified the Clift Building was an eight-story office building, 80.5 feet on Main street and 165 feet on Broadway or Third South. There are about 250 rooms above the ground floor, the space in such rooms amounting to 49,277 square feet. The building was constructed in 1919 and 1920. The witness was manager of the building for 10 months before the death of Mrs. Clift, and has been manager ever since his appointment as one of the executors.

The following statement admitted in evidence as Exhibit 3 was prepared by the witness, and was relied on to a great extent by appellants' witnesses in determining the value of the property:

| | Earnings. | Taxes. | Interest. | Commissions. | Operating Expenses. | Net Income. |
|---|---|---|---|---|---|---|
| **CLIFT BUILDING** | | | | | | |
| **1920** | | | | | | |
| Income............. | $ 74,733.70 | | | | | |
| Taxes.............. | | $19,238.70 | | | | |
| Interest............ | | | $32,166.67 | | | |
| Commissions........ | | | | $1,970.66 | | |
| Operating Expenses.. | | | | | $24,458.27 | |
| Deficit............. | | | | | | $  3,095.50 |
| **1921** | | | | | | |
| Income............. | 130,925.50 | | | | | |
| Taxes.............. | | 22,396.90 | | | | |
| Interest............ | | | 40,210.00 | | | |
| Commissions........ | | | | 7,188.58 | | |
| Operating Expenses.. | | | | | 31,627.73 | |
| Net Income......... | | | | | | 29,502.29 |
| **1922** | | | | | | |
| Income............. | 127,146.29 | | | | | |
| Taxes.............. | | 24,085.85 | | | | |
| Interest............ | | | 38,411.67 | | | |
| Commissions........ | | | | 6,984.82 | | |
| Operating Expenses.. | | | | | 34,359.96 | |
| Net Income......... | | | | | | 23,303.99 |
| **1923** | | | | | | |
| Income............. | 131,814.69 | | | | | |
| Taxes.............. | | 25,237.05 | | | | |
| Interest............ | | | 36,770.00 | | | |
| Commissions........ | | | | 7,254.24 | | |
| Operating Expenses.. | | | | | 36,410.10 | |
| Net Income......... | | | | | | 26,143.30 |
| **1924** | | | | | | |
| Income............. | 127,183.80 | | | | | |
| Taxes.............. | | 25,275.76 | | | | |
| Interest............ | | | 36,368.50 | | | |
| Commissions........ | | | | 6,994.87 | | |
| Operating Expenses.. | | | | | 35,205.66 | |
| Cost of renewing bonds............. | | | | | 9,000.00 | |
| Net Income......... | | | | | | 14,339.01 |
| **1925** | | | | | | |
| Income............. | 122,138.24 | | | | | |
| Taxes.............. | | 23,938.45 | | | | |
| Interest............ | | | 36,443.34 | | | |
| Commissions........ | | | | 6,662.78 | | |
| Operating Expenses.. | | | | | 37,953.24 | |
| Cost of renewing second bonds....... | | | | | 1,200.00 | |
| Net Income......... | | | | | | 15,940.43 |
| Total net income for 1921, 1922, 1923, 1924, and 1925 ...................... | | | | | | $106,133.52 |
| Total net income from 1920 to 1925 ........................................ | | | | | | $109,229.02 |

Assessed valuation of real estate_____$331,665.00
Assessed valuation of improvements _____ 383,335.00
Assessed valuation of personal property in
    building _____ 3,500.00

Total _____$718,500.00

Depreciation as Allowed by Government to Date of October 31, 1925.
Building, 2½% per year................................$ 66,092.25
Plumbing and heating, 5% per year.....................  21,461.75
Elevators, 10% per year...............................  24,424.00
Electrical fixtures, 7% per year......................   8,442.32
Furniture and fixtures, 10% per year..................   2,148.87

    Total ...........................................$122,569.19

### Western Union Lease.

Oct. 1920 to 1930................................$22,500.00 yearly
Oct. 1930 to 1940................................ 24,750.00 yearly
Oct. 1940 to 1950................................ 27,225.00 yearly

| Space. | Monthly Rental. |
|---|---|
| 3,480 square feet in basement at 25 cents per square foot per year | $ 72.50 |
| 9,880 square feet on seventh and eighth floors at $1 per square foot per year | 817.00 |
| 2,350 square feet ground floor—29 feet on Main—69 feet depth | 985.50 |
| | $1,875.00 |

Elevator service furnished by building 24 hours per day.

Heat service furnished during heating season 24 hours per day.

Lessee has right at any time, on giving the lessor one year's notice of its desire to do so, to take over additional space on seventh floor at $1 per square foot.

Balance of Rentable Space.

Kinema Theatre, lease expires 1930, 36 foot frontage, 160
    depth ..........................................$ 1,150.00
United Cigar Store, Main street frontage, 14 feet; Broadway
    frontage, 33 feet; lease expires 1930.................. 350.00
Blue Bird, No. 8 West Broadway....................... 100.00
Leff's fur shop, No. 10 West Broadway.................. 75.00
Cox barber shop, No. 12 West Broadway................. 225.00
Hoffman's cleaning shop, West Broadway................ 150.00
Soll's clothes shop, West Broadway..................... 150.00
Second floor, 5,350 square feet, at $2 per square foot...... 900.00
Third floor, 7,175 square feet, at $2 per square foot........ 1,196.00
Fourth floor, 7,175 square feet, at $2 per square foot....... 1,196.00
Fifth floor, 7,175 square feet, at $2 per square foot........ 1,196.00
Sixth floor, 7,175 square feet, at $2 per square foot........ 1,196.00
Balance of seventh floor, 5,347 square feet, at $2 per square
    foot ............................................ 891.00

Total amount of rents when 100 per cent rented—$10,650.00

Vacancies in building on October 23, 1925.

Rooms 200-204-205-206-207-211 .........................$ 365.00
      316-317-318 ....................................... 87.50
      408-427 .......................................... 80.00
      501-525-526-527-514-515-519-520 ................... 252.50
      610-611-616-617 .................................. 140.00
      708-731-732 ...................................... 130.00

                                              $1,055.00

Building, 80 feet by 165 feet, costs of construction........$752,858.54

The witness at a later stage of the trial stated there were two rooms on the ninth floor of the building being rented for the sum of $225 per month. These do not appear in the exhibit.

Blair Richardson, for appellant, testified he had been in the real estate business for various firms in Salt Lake City for 20 or 22 years, was familiar with the Clift building property, had negotiated sales in that vicinity, and was familiar

with the value of property there in October, 1925. In his opinion the Clift building property had a fair market value of from $700,000 to $750,000. One can ordinarily figure the value of real estate and improvements if the returns on the property are the ordinary returns. But in this case he thought the Western Union lease, which runs until 1950, materially affects the value. It pays only $1 per square foot on the eighth floor when the average rental paid in the building is $2 per square foot. The Western Union also has a lease and option on the seventh floor for a like space at the same rate. Witness mentioned other conditions which he considered unfavorably affected the value. He took the average income from the property for the last five years, the interest due on the bonds, and allowed 2 per cent. for depreciation, which was less than the government allows, and this gave him the sum of $720,000. Where one has a permanent improvement on real estate, such as the Clift building, its market value is determined largely by the income derived from the property. Witness had had occasion to ascertain the value of adjoining property, the Royal Bakery. It sold for close to $4,000 a front foot. He valued the land on which the Clift building was erected at $420,000. The figures show the building cost $750,000. The directory last year showed about 10 per cent. of the space in the building not occupied and the same this year, 1926; that is about the case generally. Witness' attention being called to the fact that he had valued the land alone at $420,000, which, when added to the cost of the building $750,000, aggregated $1,170,000, he accounted for the difference between that and his valuation of the entire property by saying that the property had shown in the last five years what it will produce. The property during the last five years has produced a net income of only $106,000, which is not within $20,000 as much as the government would allow for depreciation. Taking all these things into consideration in arriving at the value, it is useless to appraise the building at anything like what it cost. He obtained his figures from

the manager of the building. In arriving at the fair valuation of property, one should take into consideration the physical value of the property, its mortgages, incumbrances, and restrictions. He figured the office space in the building was worth close to $2 a foot rental. The Western Union is paying only $985 a month for the space it us using on the ground floor. He was satisfied it was worth $1,500. The Kinema Theatre is paying for its lease $1,500 a month. It is worth more. The total possible rent for the building the way it is managed would be $127,800 a year. The existence of the $510,000 mortgages on the property bearing interest at 6½ per cent, and the fact that it cannot be paid off except on the terms fixed in the mortgage, affects the value of the property. That rate of interest is not higher than the current rate for that size and on that kind of property. By the size he meant the percentage of the amount to the value of the building. A loan was made on the Constitution building, Main street, at nearly 50 per cent. of its value, interest 5½ per cent., within the last 2 years. The mortgage was to run 5 years. He solicited a number of owners of property near the Clift building where a loan could have been obtained for 50 per cent of the value at 5½ per cent interest. Under ordinary circumstances the property must be worth twice the loan.

John E. Russell, for appellant, testified he had had charge of the real estate and mortgage department of the Bankers' Trust Company, Salt Lake City, for more than 3 years. Before that he was in the real estate business in Salt Lake City for two years. He had had occasion to negotiate the sale of the Herald building on Main street near Second South, and also represented the Liggett people in purchasing the northwest corner of Main and Second South. He had investigated several pieces of property on Main. His business required him to have knowledge of values in the vicinity of the Clift building. He was fairly well acquainted with the value of the Clift building property in October, 1925. In his opinion, the fair market value of the property was

$750,000.  He took into consideration very largely the income from the property; also the existence of the $510,000 mortgages and the Western Union lease and Mehesey lease. It was necessary to consider these items in determining the value.  The leases and the mortgages referred to affect the value unfavorably.  An assignment of 5½ per cent. of the rent up to September 10, 1930, would also affect the value unfavorably.  Whether the assignment would affect the value unfavorably would depend to some extent upon what services were to be performed for that consideration.  It is not necessary to have two collectors of the rent if the one collecting is located on the property.  The value he had theretofore put on the real estate without the building was $378,000.  The rental per month on the Western Union lease, including the ground floor and the space occupied on the seventh and eighth floors, is $1,875 a month.  Witness on cross-examination said he would not think that all of the revenue produced from seven of the floors, including the ground floor, would be required to pay the operating expenses of the building.

James Collins, for appellants, testified he was connected with Tracy Loan & Trust Company, Salt Lake City, as vice-president of the company; has been connected with the company 21 years.  Its business is real estate and mortgage loans principally; also management of estates and properties.  He is required to be familiar with market values of real estate in the office section of the city; was familiar with the Clift building property in October, 1925.  In his opinion, the fair market value was $800,000.  He considered the value of the ground, the value of the building, coupled with the income it produced, and the contracts that exist upon it, in order to get a reasonable figure for a prospective purchaser.  The income is of vital importance.  Witness was acquainted with the Western Union lease.  His company had had the management of the Clift building for several months.  He had tried to get the lease canceled or the rental increased, but failed.  In his opinion, the lease

affected the value of the property unfavorably to the extent of $100,000. The Mehesey lease also affects the value unfavorably. Mehesey afterward sold his lease at a profit of approximately $100,000. If Mrs. Clift in her lifetime made an assignment of 5½ per cent. of the rentals to Halloran-Judge Trust Company from September 10, 1920, to September 10, 1930, that would affect the value unfavorably. Halloran-Judge Trust Company succeeded Tracy Loan & Trust Company in handling the property. They made a contract with Mrs. Clift for 5½ per cent. of the rentals. She was afraid she was going to lose the property. Halloran-Judge attempted to carry the large loan on the second mortgage issue, and got a commission for doing it. That is the reason they entered into the contract.

Edward M. Ashton, for appellants, business, real estate, and mortgage loans, vice president of Ashton-Jenkins Company: Been connected with that company 24 years; was familiar with the Clift Building property in October, 1925. In his opinion the fair, reasonable market value of the property was $750,000. He took into consideration the income from the property as one of the main factors; also the location of the property, the condition of the building, the general rental conditions in the city, and the building itself. He thought the Western Union lease, the Mehesey lease, and the 5½ per cent. contract with Halloran-Judge affected the value unfavorably. He used very largely the net income as a basis of value, computed on a basis approximately of 6 per cent. The $510,000 mortgage indebtedness, extending over a period of years, also affected the value unfavorably. He figured the income derivable from the property at $127,800 per annum, the operating expense at $38,000, taxes $24,000, and commission $6,600. These are ordinarily normal figures, but witness would later make deductions. These figures give the amount of $57,100. The history of the building shows a vacancy condition of approximately 10 per cent. For this he deducted $12,000, which reduces the income to $47,100. He figured that the building had 1,370,000

cubic feet in it. On the basis of cost, with which he was familiar, the cost of superintendence of other building which his company had financed, namely, the Medical Arts building, the cost is about 50 cents a cubic foot. The Clift building should cost about $660,000. He allowed for depreciation on that 2 per cent., or $13,200, still further reducing the net to $33,900. He also figured that about $500 a month additional revenue could be obtained from the Mehesey and cigar store leases, which would give a return of $6,000 extra per annum after their present leases expire. That would increase the net revenue to $39,000. He also thought there was a waste of $2,600 in operating the building because of the 5½ per cent. commission contract. This saving would increase the net to $42,500, and he thought $2,500 more could be saved in the operation of the building itself. An iron furnace should be put in, and slack coal used as against hard coal, and thereby reduce that expense. The net revenue will thereby be increased to $45,000 a year, which is 6 per cent. of $750,000, at which he values the property. Six per cent is about what the property is producing now, and has been for some time. He was able to furnish an itemized statement of every item spent. He obtained his information from the books of the corporation, the management of the building, and personal investigation. He gave the items in detail, which substantially sustained his contentions as above stated. If the items taken from the books are shown to be wrong, the items are subject to correction. All expenses in operating the building should be considered in his method of computing value. As to the matter of the 5½ per cent commission, if that is an assignment as claimed, that is not subject to reduction.

Harrison Jenkins, for appellants, testified he had been engaged in the business of insurance and appraising 25 years in Salt Lake City; was familiar with the Clift Building property in October, 1925. In his opinion, the reasonable market value was $810,000. He took into consideration the capitalized value of the net income of the property and de-

preciation for the age of the building. The Western Union lease affected the value of the property adversely over $200,-000. The Mehesey lease affected the value unfavorably $5,000 or $6,000. The outstanding mortgages, $510,000, and the 5½ per cent commission also affect the value unfavorably. He used 6 per cent interest as a basis. He was one of the county appraisers. They appraised the equity in the property at $300,000. They took into account the $510,-000 mortgages. He was one of the three county appraisers. They all agreed upon the value of the equity. They took into consideration the history of the property and the leases outstanding. They also considered there was a vacancy of about 10 per cent. Notwithstanding the vacancy, he considered the Western Union lease a liability instead of an asset. It has a tendency to depreciate the value.

Lawrence Heath, recalled, testified he furnished appellant's witnesses with the information contained in Exhibit 3. The exhibit correctly sets forth the income from the Clift building and disbursements during the period covered. The operating expenses as set forth in the exhibit were necessary to a successful management of the building. Witness said that except about one hour each day during business hours he had devoted all his time to the management. Only $60,000 of the $80,000 bond issue is outstanding, and that was outstanding at the date of Mrs. Clift's death. The rent per foot as estimated does not include the hall space, except that the Western Union is paying for all the space on the eighth floor.

Karl Hardy, for respondents, testified he had been engaged in real estate and loan business in Salt Lake City for 29 years with the Home Investment Company. He is now cashier, and has had occasion to determine the market value of real estate in Salt Lake City. He has attended to the appraisement of property for his company. He is also one of the state inheritance tax appraisers for Salt Lake county, and has been for 6 years. In that position he has had a

considerable amount of experience, and has appraised a great number of estates. Mr. Kriebel has been on the board the entire time, and Mr. Jones for nearly 2 years. They appraised the estate of Mrs. Clift. If they had known that the indebtedness against the estate on the $80,000 bond issue was only $60,000, they would have appraised the equity at $440,000, instead of $420,000, as in their original appraisement. Witness has appraised eight or ten properties on Main street, but not as of October, 1925. He arrived at the valuation they placed on the Clift building property— the ground—by comparison with other properties, and their selling values. The most recent sale was the Royal Bakery on Main street, in the center of the same block. It sold for $3,100 per front foot without the building. He valued the inside property of the Clift Building on Main street, without the building, at the same price per foot, and added 75 per cent for the property on the corner. That is the usual method. He valued the real estate—ground—at $417,000. They considered the cost of the building; consulted architects as to what it would cost to replace it. They found it cost in the neighborhood of $800,000. He took the square feet of the building, and took the statements of reliable architects as to what it would cost to reproduce the building at $6.50 per square foot, and found it to be $770,026, which is close to what it cost. They also considered the statement of the people themselves at the time they floated the bond issue. They represented that the land and building had been conservatively appraised in excess of $1,200,-000. He compared the property with that of the Walker Bank building on the corner of Main and Second South. He was looking for comparison of values. The Walker Bank property is carried on the books of the company at $1,144,-077. The two properties are almost the same size. The Clift building is a first-class office building and store building. He and the other two appraisers considered the Western Union lease, discussed it with the executors. They made a substantial reduction on that account. They also con-

sidered the 5½ per cent Halloran-Judge contract and the Mehesey lease. The Western Union lease in one sense would enhance the value of the property. The Western Union Company is a public utility of the kind that attracts to that corner, and has a tendency to build it up and make the corner more valuable. That would in a sense offset part of the low lease they obtained. The value the appraisers finally put on the property represents a compromise value reached between the appraisers and the executors. It appeared to be satisfactory to Mr. Smith and the executors. They wanted the inheritance tax to come within $20,000. The equity at a value of $400,000 would, at 5 per cent, produce a tax of $20,000. On cross-examination, the witness said he considered the property worth $950,000, taking all of these things into consideration. If there were no outstanding leases, it would be worth probably $75,000 to $100,000 more. Witness obtained his information about the Western Union lease from Mr. Collins, and also Mr. Howell, attorney for the executors. The Mehesey lease was also explained to them by Mr. Howell. The estimated value of the ground added to the estimated value of the building was one factor in arriving at the value, but that was not taken as the appraisement. They valued the ground, originally, at $417,000. In the final appraisement they valued it at $400,000 and the building at $550,000. These figures were compromise figures. He thought the value of the building should be much higher than $550,000. In valuing the ground, they figured so much per front foot for the inside property on Main street, so much for the corner, and so much for the frontage on Third South. The figures as to income did not seem adequate to the witness. He thought such a building would produce more than the figures showed. He did not say to the executors that income did not enter into the market value. They had the same statement Mr. Ashton used; at least it appeared to be the same. It was similar. It was obtained from Mr. Heath. It showed the income and operating expenses at the time the appraise-

ment was made. It was obtained either from Mr. Heath or Mr. Howell—witness was not certain which. The value of real estate cannot be ascertained altogether by the income derived from it. Some of the most valuable property in a business section would not have an income to authorize such appraisement as the property should have. Any purchaser buying the Clift building would consider the income that could be derived from the property. The appraisers took the income into consideration. They consulted various people engaged in such business as to what the income should be. They worked on it for 35 or 40 days. The current rate of interest charged for loans on business property in Salt Lake City would range from 5 to 6½ per cent. Everything would have to be exceptionally good to get a 5 per cent rate. At the time of Mrs. Clift's death, it was possible to get as low a rate as 5½ per cent. The tendency is toward lower interest. He discussed the value of the property with Mr. Russell, Mr. Richardson, and Mr. Pinney, the building inspector of Salt Lake City; also discussed with several real estate business men who were familiar with property of that kind, including Mr. Halloran, Mr. Richardson, and Mr. Russell, before arriving at the value. This was some time ago, and we went into great detail to get the facts; consulted with Mr. Halloran during the time they were making the appraisement. After consulting with Mr. Howell and Mr. Heath, the appraisers made concessions; that is, what he meant by compromise appraisement. The fact that there was a bond issue of $450,000 on the property verified the statement in the prospectus to the effect that the entire property was worth $1,200,000. Besides, there was another bond issue of $80,000. They could not have floated the bond issue, unless the value was there to sustain it.

Mr. Kriebel, for respondent, testified he had resided in Salt Lake City 22 years, engaged in insurance and investments. His business has made him familiar with real estate values in Salt Lake City only to a limited extent. He

is one of the inheritance tax appraisers, and has been such for over 5 years. They valued the entire property at $950,-000. In appraising the property, they appraised it at $420,-000, for that was the value after deducting the indebtedness of $530,000. They had several meetings with the executors and their attorneys before they determined the value. The appraisers had knowledge of the outstanding leases, and discussed them with Mr. Heath, Mr. Howell, and some other gentlemen. Mr. Howell told them the contents of the leases. They took into consideration the lease on the cigar store. They were all under discussion. He estimated the cost of the building at $777,026. That represents the cost of the building at $6.50 per square foot. That was the lowest for 1925. The average was $8.02. The building in 1925 could have been replaced for $6.50 per square foot. From that they made a deduction of $200,000 for the leases, commissions, and everything which has been charged against the property. He wanted to be as liberal as he knew how. They then valued the lot at $400,000. That is the way he arrived at the value. Each appraiser had a different way of arriving at the value, but they finally got together, reconciled their figures, and made a further deduction of $27,-000. Mr. Howell said it was satisfactory.

William R. Jones, for respondent, resides in Salt Lake City, and has for 69 years; during last 15 years has been selling advertising, but a great deal of the time engaged in real estate loans and insurance; was acquainted with some values in vicinity of the Clift building. Is one of the inheritance tax appraisers who appraised the Clift estate. They appraised the Clift building property at $420,000, after subtracting the indebtedness from the entire value, which indebtedness they understood to be the two mortgages, one for $450,000 and the other for $80,000. They met with the executors before arriving at the value. The leases were taken into consideration in determining the value. He regarded the leases as a burden; especially the Western Union lease. He estimated the real estate a little higher than the

the other members of the board, and the cost of the building a little lower, but they finally got together. He estimated the cost of the building at the time it was constructed. The cost of material and the cost of labor was considered. The cost of building per foot is published each month. One can take what is ordinarily charged per square foot and multiply that by the number of square foot, and arrive at the cost, unless the building goes over too long a period. In this case the building is not old enough to allow much for depreciation. A building of that quality does not depreciate until it gets 10 or 15 years of age.

Lawrence H. Heath, in rebuttal for appellants, testified: If the building was fully occupied at the maximum rental of $2 per square foot, and every cent of it collected, it would amount to $10,875 per month. Witness was present at the meetings testified about by respondent's witnesses when the question of value was discussed. Exhibit 3 had not been prepared prior to the date of the appraisement. None of the appraisers saw that report. Witness offered the records and any information the appraisers wanted. They said they did not need them. He at one time showed the figures relating to income to Mr. Kriebel—the list relating to refinancing the loan—and told him witness was ready to give that out in detail so they could work on it intelligently. He promised to let witness know, but the next thing he had from Mr. Hardy and Mr. Kriebel they said they did not need it. Mr. Howell never stated in witness' presence that he was satisfied with the appraisement. He said, "I guess that is the best we can do, and we will have to be satisfied." The rentable space in the building, including the ground floor, is about 62,350 square feet. There is a large space on the north under Mehesey lease, occupied by Kinema Theatre, where there is no space above the ground floor. About 48 per cent of the building is not rentable. In addition to the Kinema portion, where there is only the ground floor, there are halls, elevator shafts, pipe shafts, and court lights.

If the theater was out of the way, there would be more office space.

Such is the substance of the evidence introduced at the trial. As before stated, the court, at the conclusion of the evidence, permitted the respondents to amend their appraisement, so as to show that they appraised the entire Clift building property at the value of $950,000, instead of the equity only at $420,000, as in their first report.

The burden was upon the appellants to prove by a clear preponderance of the evidence that the appraisement made by the appraisers was too high. As before stated, all of the witnesses on both sides of the case appear to have been men of wide experience in matters pertaining to the value of real estate. As appears from their testimony, each witness pursued his own method of arriving at the valuation. Every witness took into consideration the various incumbrances and unfavorable restrictions affecting the value, and made deductions accordingly, some more and some less. Witnesses for appellants probably allowed greater deductions on that account than did the witnesses for respondent. Appellants' witnesses also appeared to attach more importance to the question of income than did the witnesses for respondent; yet respondent's witnesses also testified that they considered the question of income in arriving at their appraisement. The evidence shows that the Clift building is a normal office building of the first class, situated at or near the center of business. It is a going business concern, with nothing to affect the normal value of the property, except the incumbrances and restrictions above referred to. As to the amount that should be deducted on account of these, the majority of the witnesses gave no figures; some of them did. Most of the witnesses for appellant took the average income from the property for the five years during which the building had produced an income from 1921 to 1925, inclusive, and made that a prominent factor in their estimates of the value. Two of

the witnesses for appellants adopted a 6 per cent income to the owner as a proper return on such an investment, and, after making deductions, as before stated, applied such per cent to the net income, and thus arrived at their estimates of the value. The usual and ordinary rate of interest on loans secured by real estate mortgages was shown to be from 5 to 6½ per cent. The only witness who mathematically particularized his method of arriving at the value was Mr. Ashton, and, had it not been for an error in his premises, his method would have been more than ordinarily satisfactory; that is to say, it would have shown that he reached his conclusion by a mathematical computation meticulously followed out to a definite conclusion. He estimated the value of the property at $750,000. He used the net income from the property, after making some deductions and additions, as a basis of value computed on a basis of 6 per cent per annum. He adopted as a starting point the gross average income from the property during the five years above mentioned, which was $127,800 per annum. From this he deducted expenses of operation, $38,100, for taxes, $24,500, commissions, $6,600, and, as the evidence showed there had been a vacancy in the occupation of the building of 10 per cent he deducted on that account the amount of $12,000. He had estimated the cost of the building by a method in use, and found it to be $660,000. Upon this amount be made a further deduction of 2 per cent for depreciation, $13,200. These deductions from the gross annual income left a net income of $33,900. The witness conceived there might be a saving which would materially add to this amount, and made the following additions: $6,000 per annum increase of rent on the property now under the "Mehesey lease," after the lease expires; a saving of $2,600 in operating the building when the Halloran-Judge contract expires; and $2,500 in operating the building by substituting an iron furnace and the use of slack in heating the building. These additions raised the possible income to the sum of $45,000, which is 6 per cent of $750,000. That.

was the sum at which he valued the property. Two other witnesses for appellants valued the property at the same amount, but arrived at their conclusions by different methods. The vital mistake made by the witness Ashton, as we read the record, was in making the deduction of $12,000 for vacancies in the occupation of the building. That, according to his method, would have been proper enough if the $127,800 had been the estimated gross annual income based upon a 100 per cent occupation. But the fact is that the $127,800 was the exact ammount of the average annual gross income that had actually been received during the 5 years of occupation, as shown by the exhibit which we have quoted at length. In order to correct his error, the $12,000 should be added to the $45,000 net income found by the witness, thereby increasing it to the sum of $57,000, which is exactly 6 per cent of $950,000, the value at which the property was appraised.

Considering the evidence as a whole this court does not feel justified in holding that the findings of the court as to the sufficiency of the evidence are against a clear preponderance of the evidence or even against a mere preponderance.

Other errors of a technical nature are assigned as to the findings. While some of the findings are not in artistic form according to approved models, nevertheless, they indicate clearly the mind of the court. Such assignments are therefore without merit.

The judgment of the trial court is affirmed, at appellants' cost.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.